## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| MARINA PORTILLO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 8:21-cv-02894-PX |
| | * | |
| H RESTAURANT AND NIGHT CLUB | * | |
| d/b/a WHEATON LOUNGE, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | ****** | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Plaintiff Marina Portillo ("Portillo")'s motion for entry of default judgement, ECF No. 30, and her motion for leave to file excess pages, ECF No. 29, which is granted. Defendants H Restaurant and Night Club, LLC d/b/a Wheaton Lounge ("Wheaton Lounge"), RAR Group, Inc. d/b/a El Tipico Domincano ("El Tipico"), Jose Lopez ("Lopez"), and Rafael Reyes ("Reyes") (collectively "Defendants") have not responded to this motion, and the time for doing so has passed. *See* Loc. R. 105.2.a. The matter has been briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motion for default judgment is granted in part and denied in part.

## I.      Background

The Court accepts as true the well-pleaded factual allegations in the Complaint. Lopez and Reyes operated two restaurants together and on the same premises in Silver Spring, Maryland. ECF No. 1 ¶ 16. Lopez owned and ran Wheaton Lounge, and Reyes ran El Tipico. *Id.* ¶¶ 13–18. The men employed over 15 servers in total. *Id.* ¶ 24.

Lopez hired Portillo as a server in February of 2019.  ECF No. 1 ¶¶ 27–28.  While Lopez primarily worked at Wheaton Lounge, she also worked at El Tipico at the direction of Lopez or Reyes.  *Id.* ¶ 20.  Lopez and Reyes both assigned Portillo tasks, evaluated her performance, and controlled her schedule.  *Id.* ¶¶ 30, 34–38.  Neither Lopez nor Reyes ever informed Portillo of her rights under federal, state, or local wage and hour laws, nor did the restaurants post any related information.  *Id.* ¶¶ 163, 172.

Portillo worked for Defendants a total of ten months, during which time she never received an hourly wage or a paycheck, and her supervisors never recorded her hours.  ECF No. 1 ¶¶ 138–42.  Instead, Portillo was paid solely in tips.  *Id.* ¶ 142.  She worked an average of 42 hours per week for the first five months of employment and an average of 34 hours per week the last five months.[1]  ECF No. 30-1 at 1.

As part of her compensation, Lopez and Reyes promised Portillo commission on food and beverage sales.  If her sales exceeded $600 on a weekday shift or $1,000 on a weekend shift, she would receive a cash bonus of $60 or $100 respectively.  ECF No. 1 ¶ 143; ECF No. 30-1 at 1.  Even though Portillo met the sales requirement on approximately two-thirds of her shifts, she only received her bonus half of the time.  ECF No. 1 ¶ 146; ECF No. 30-1 at 1.

Lopez and Reyes also required that Portillo either clean the restaurant after closing for free or pay them $10.  ECF No. 30-1 at 1.  Portillo always paid the $10 because she did not want to work without pay, nor did she feel safe staying at the restaurant after closing.  *Id.*  Portillo also had to pay Lopez and Reyes whenever a customer did not pay the bill.  *Id.*  The customer checks that she had to pay totaled $600, $250, and $125 respectively.  *Id.*

---

[1] The Complaint mistakenly alleges that Portillo worked 43 hours per week during the first half of her employment and 26 hours per week during the second half.  *See* ECF No. 1 ¶¶ 150–51.  Portillo clarified her hours in her affidavit and motion for default judgment.  *See* ECF No. 30 at 8 n.2, 43 n.10; ECF No. 30-1 at 1.

Portillo's working environment was also permeated with sexual violence.[2]  To attract business, Lopez and Reyes condoned and encouraged customers to sexually harass and proposition the female servers.  ECF No. 1 ¶ 43.  On one occasion, a customer offered Portillo $500 in exchange for sex, and Lopez urged her to accept the offer.  *Id.* ¶ 45.  Lopez and Reyes further instructed the servers to drink on the job and forbade them from refusing a drink purchased by a customer.  *Id.* ¶ 50.  Customers routinely bought drinks for the servers, and as a result, Portillo often ended her shifts completely inebriated.  ECF No. 30-1 at 1–2.

Lopez and Reyes also continuously sexually harassed and assaulted Portillo.  Reyes made sexual comments about Portillo's appearance and groped her on multiple occasions.  ECF No. 1 ¶¶ 81–85; ECF No. 30-1 at 2–3.  Portillo repeatedly objected to his conduct.  *See* ECF No. 30-1 at 2.  When Portillo refused to engage in a sexual relationship with him, Reyes shunned her at work, refusing to talk to her or answer questions about how she should perform her job.  ECF No. 1 ¶¶ 87–88.

Lopez and Reyes also required the servers to stay after work and drink with them, warning them that there would be negative consequences for those who refused to comply.  ECF No. 1 ¶¶ 51, 91.  Once, after Portillo was forced to stay after work, she witnessed Reyes raping her unconscious female coworker.  *Id.* ¶¶ 57, 61.  The coworker later filed a police report, and when Defendants found out, they immediately fired her.  *Id.* ¶¶ 66–70.  Lopez and Reyes announced at a server meeting that the victim had been "stupid" in calling the police.  *Id.* ¶¶ 70–71.

Several months after Portillo began her employment, Lopez forced her to stay after work.  ECF No. 1 ¶¶ 89–96.  He then raped her.  *Id.*  Portillo told Lopez the next day that she would not

---

[2] Defendants had no anti-harassment policy or reporting procedures, nor did they post any information about their employees' rights under federal, state, or county anti-discrimination laws.  ECF No. 1 ¶¶ 32–33.

have any future physical relations with him.  *See id.* ¶¶ 99–110.  Lopez, in response, redoubled his sexual aggression; in the following months, he groped Portillo repeatedly and tried to trap her in the restaurant one night.  *Id.*  When Portillo threatened legal action, Lopez became enraged and told Portillo that he had "really good lawyers" and that she should "be careful with her words."  *Id.* ¶¶ 111–14.

In early November of 2019, Lopez raped Portillo again, after hours and under similar circumstances as the first rape.  ECF No. 1 ¶¶ 116–21.  Shortly after, a customer left Portillo a $100 credit card tip.  *Id.* ¶ 122.  Without proof, Lopez accused Portillo of writing the tip on the customer's receipt without permission. *Id.* ¶¶ 123–24.  He warned Portillo that she was now "under the microscope."  *Id.*

 A month later, Portillo's employment abruptly ended.  During one shift, Portillo took a drink from the bar to serve to a customer before she had placed the order in the restaurant's computer system.  ECF No. 1 ¶¶ 127–28.  The restaurants shared two computers that 16 servers were expected to use.  *Id.* ¶ 129.  Lopez and his brother, who managed one of the restaurants, had clearly permitted this practice of serving drinks prior to entering the order in the computer so that service would not be delayed.  *Id.* ¶¶ 129, 131.  This time, however, Lopez accused Portillo of stealing the drink and fired her on the spot.  *Id.* ¶¶ 132–33.  Lopez had never disciplined another server for this reason, and the week before, Portillo had observed a server who acquiesced to Lopez' and Reyes' advances do the same thing without incident.  *Id.* ¶¶ 134–35.

After her termination, Portillo fell into a deep depression.  ECF No. 30-1 at 6.  She did not leave her apartment, stopped bathing, and had to rely on her friends to bring her food.  *Id.*  Without any ability to work, Portillo lost her home and car.  *Id.* at 6–7.  By November 2020, Portillo was able to return to work, but she had gained substantial weight.  *Id.* at 6.  She still

suffers from headaches, bouts of nausea, suicidal ideation, and panic attacks so severe that occasionally she has required emergency care. *Id.* at 6–7. She has also struggled to form healthy relationships with men; she hates being touched, is fearful of enclosed spaces, and worries constantly that someone has spiked her food or drink. *Id.* She engages in self-harm to cope with the severe emotional pain. *Id.* at 6.

On May 21, 2020, Portillo filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 1 ¶ 7. She cross-filed her charge with the Maryland Commission on Civil Rights and the Montgomery County Office of Human rights. *Id.* On September 9, 2021, the EEOC issued Portillo a Notice of Right to Sue. *Id.* ¶ 8.

On November 10, 2021, Portillo filed a 19-count Complaint against Defendants, alleging a variety of statutory and common law claims. ECF No. 1. The first ten counts assert wage and hour violations under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Maryland Wage and Hour Law (the "MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*, the Maryland Wage Payment and Collection Law (the "MWPCL"), Md. Code Ann., Lab. & Empl. Art., §§ 3-501, *et seq.*, and the Montgomery County Minimum Wage Law (the "MCMWL"), Montgomery, Md. Code §§ 27-67, *et seq.* (Counts 1–10). *Id.* ¶¶ 157–235. Counts 11 through 16 relate to the pattern of alleged sexual assault and harassment, actionable under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Maryland Fair Employment Practices Act (the "MFEPA"), Md. Code Ann., State Gov't §§ 20-601, *et seq.*, and the Montgomery County Human Rights Law (the "MCHRL"), Montgomery, Md. Code §§ 27-6, *et seq.* ECF No. 1 ¶¶ 236–301. Last, Portillo brings common law claims of battery and intentional infliction of emotional distress against Lopez and Reyes individually (Counts 17–19). *Id.* ¶¶ 302–25.

Portillo properly served Defendants, ECF Nos. 7 & 9, but they have made no effort to participate in this litigation.  The clerk entered default on January 13 and June 22, 2022, pursuant to Federal Rule of Civil Procedure 55(a), and notified Defendants by mail of the default.  ECF Nos. 12, 15–17, 21–24.  Lopez responded that he would represent himself, but never participated in the case.  ECF No. 18.  Portillo thereafter moved for entry of default judgment as to all Defendants.  ECF No. 30.  Still Defendants did not respond.  For the following reasons, default judgment will be entered in Portillo's favor on Counts 1–7 and 10–19, and denied on Counts 8 and 9.

## II.    Standard of Review

Rule 55(a) provides that "[w]hen a party against whom a judgement for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  "A defendant's default does not automatically entitle the plaintiff to the entry of a default judgment; rather, that decision is left to the discretion of the court."  *Joe Hand Promotions, Inc. v. Luz, LLC*, No. DKC-18-3501, 2020 WL 374463, at *1 (D. Md. Jan. 23, 2020); *see S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).  While the Fourth Circuit maintains a "strong policy that cases be decided on the merits," default judgement may be appropriate where a party is wholly unresponsive.  *Lawbaugh*, 359 F. Supp. 2d at 421 (internal quotation marks omitted) (quoting *Dow v. Jones*, 232 F. Supp. 2d 491, 494–95 (D. Md. 2002) (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993))).

When considering a motion for default judgement, the Court accepts as true all well-pleaded factual allegations, other than those pertaining to damages.  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) ("The defendant, by his default, admits the plaintiff's

well-pleaded allegations of fact … [but] [t]he defendant is not held … to admit conclusions of law" (citation and internal quotation marks omitted)); *Disney Enter., Inc. v. Delane*, 446 F. Supp. 2d 402, 406 (D. Md. 2006) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not." (citations omitted)).  Courts in this district analyzing default judgments have applied the standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to determine whether the allegations are well-pleaded.  *See, e.g., Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544–45 (D. Md. 2011); *Russell v. Railey*, No. DKC-08-2468, 2012 WL 1190972, at *3 (D. Md. Apr. 9, 2012); *United States v. Nazarian*, No. DKC-10-2962, 2011 WL 5149832, at *3–4 (D. Md. Oct. 27, 2011).

Where a complaint offers only "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement," the allegations are not well-pleaded and, consistent with the Court's discretion, relief should be denied.  *Balt. Line Handling*, 771 F. Supp. 2d at 544 (internal citations omitted) ("The record lacks any specific allegations of fact that 'show' why those conclusions are warranted."); *see also Basba v. Xuejie*, No. PX-19-380, 2021 WL 242495, at *3 (D. Md. Jan. 25, 2021).  In this respect, "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover."  *Balt. Line Handling*, 771 F. Supp. 2d at 540 (internal quotation marks omitted).  Rather, the Court must decide whether the "well-pleaded allegations in [the plaintiff's] complaint support the relief sought."  *Ryan*, 253 F.3d at 780.

Once liability is established, the Court cannot rely solely on the Complaint to assess damages.  *See Lawbaugh*, 359 F. Supp. 2d at 422; *Trs. of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, No. DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14,

2009).  The Court may either conduct an evidentiary hearing or accept affidavits and other

documentary evidence into the record to determine what damages, if any, are warranted.  *See*

*Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010) (citations omitted).

## III.   Liability

### A.     Wage and Hour Claims (Counts 1–10)

Portillo contends that Defendants are jointly and severally liable for the wage and hour

claims.  *See* ECF No. 30 at 3–4.  Accordingly, the Court must first determine whether each

named Defendant is properly considered an "employer" for purposes of the wage and hour laws.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest

of an employer in relation to an employee." 29 U.S.C. § 203(d).  Wheaton Lounge and El Tipico,

the corporate entities which hired Portillo through their principals Reyes and Lopez, are each

considered an "employer" under the broad definition of the statute.  *See* 29 U.S.C. § 203(g)

(defining "employ" as "to suffer or permit to work"); *see also* Md. Code Ann., Lab. & Empl. §

3-401; Montgomery, Md. Code § 27-67(b).

Individuals, too, may be liable as employers if they have extensive managerial

responsibilities and exert "substantial control of the terms and conditions of the work of

[plaintiff] employees." *Falk v. Brennan*, 414 U.S. 190, 195 (1973); *see also Roman v. Guapos*

*III, Inc.*, 970 F. Supp. 2d 407, 416 (D. Md. 2013).  The analysis is fact-intensive, driven by the

"economic reality" of the employer-employee relationship. *Gionfriddo v. Jason Zink, LLC*, 769

F. Supp. 2d 880, 890 (D. Md. 2011); *see also Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436,

472–73 (2018).

Lopez and Reyes own and are the sole proprietors of the corporate entities.  They also

directly hired and fired staff and controlled all aspects of Portillo's employment.  ECF No. 1 ¶¶

14, 18, 34–38.  Thus, each are liable as Portillo's "employer" under the FLSA and companion statutes.  *See Roman*, 970 F. Supp. 2d at 417; *see also Qun Lin v. Cruz*, 247 Md. App. 606, 637–38 (2020).

Next, the Court must determine whether Defendants are liable as "joint employers" under the federal and state wage and hour laws.  "Separate persons or entities that share control over an individual worker may be deemed joint employers" under the FLSA and companion statutes. *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006); *McCoy v. Transdev Servs., Inc.*, No. DKC 19-2137, 2022 WL 951996 at *6–7, 15 (D. Md. Mar. 30, 2022) (applying FLSA joint employer framework to MWHL and MWPCL).  Six non-exhaustive factors govern the joint-employment analysis.  *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 139, 143 (4th Cir. 2017).

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
>
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
>
> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
>
> (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
>
> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling

> payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Salinas*, 848 F.3d at 141–42.  "[B]ecause the status of a particular employment relationship is highly fact-dependent . . . the absence of a single factor—or even a majority of factors—is not determinative of whether joint employment does or does not exist."  *Hall v. DIRECTV, LLC*, 846 F.3d 757, 770 (4th Cir. 2017); *see also McCoy*, 2022 WL 951996, at *7.

Portillo has demonstrated that all Defendants jointly employed her.  First, the two corporate entities, the restaurants, shared physical space, infrastructure, and workers.  ECF No. 1 ¶¶ 16, 30.  Lopez and Reyes separately owned each of the restaurants but shared everything else regarding the management and operations.  They shared day-to-day supervisory responsibilities, held joint server meetings, and set the server schedules, assignments, and restaurant rules.  *Id.* ¶¶ 30, 34–37, 70–71.  Lopez and Reyes, in short, conducted their businesses as one.

Having established that all Defendants are employers who jointly employed Portillo, the Court next must decide whether Portillo is considered an "employee" under the wage and hour laws.  An "employee," is defined as "any individual employed by an employer," 29 U.S.C. § 203(e)(1).  Whether a worker is an employee depends on the "economic realities" of her relationship with the employer.  *Salinas*, 848 F.3d at 150 (quoting *Schultz*, 466 F.3d at 304).  The Court considers six factors:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Schultz*, 466 F.3d at 304–05.

Each factor tilts in favor of Portillo as an employee.  Portillo enjoyed no agency or flexibility in how she performed her job duties.  Defendants set her schedule and dictated the way she carried out her work.  *See* ECF No. 1 ¶¶ 34–37.  Further, Portillo depended on Defendants for her livelihood; she performed as a waitress to get paid and was not compensated for any particular "creativity, ingenuity, and skill."  *Cf. Salinas*, 848 F.3d at 150.  Portillo made no economic investments in the business, nor did she enjoy any profit sharing.  And even though Portillo was entitled to a commission if she met certain sales goals, *see* ECF No. 1 ¶ 143, these bonuses alone are insufficient to render Portillo "in business for [herself]," *Salinas*, 848 F.3d at 150.  On the whole, Defendants controlled the conditions of Portillo's employment.  *Cf. Elsayed v. Fam. Fare LLC*, No. 1:18-1045, 2020 WL 4586788, at *9 (M.D.N.C. Aug. 10, 2020), *aff'd*, No. 21-1744, 2023 WL 5842301 (4th Cir. Sept. 11, 2023) (individual who "controlled important aspects of her own work" was independent contractor).  Thus, for purposes of the wage and hour claims, Portillo was Defendants' employee.

The Court next considers the wage and hour violations.

### 1.     Unpaid Minimum and Overtime Wages

Counts 1 through 6 allege Defendants' failure to pay Portillo minimum and overtime wages, in violation of the FLSA, MWHL, and MCMWL.  ECF No. 1 ¶¶ 157–82; *see also* ECF No. 30 at 19–23.  The FLSA and MWHL require employers to pay their employees the minimum wage for all hours worked, and overtime pay of at least one and one-half times the regular wage for hours worked over 40 hours per week.  29 U.S.C. §§ 206(a), 207(a); Md. Code Ann., Lab. & Empl. §§ 3-413(b), 3-415(a); *see also Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001) (MWHL mirrors the FLSA); *Turner v. Hum. Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003) (same).  The MCMWL "sets the minimum wage for Montgomery County and

requires that employers pay their employees the highest wage required from among the FLSA, the MWHL and the [MCMWL]." *Qun Lin*, 247 Md. App. at 735 n.10.

For tipped work, each statute also provides a "tip credit" for employers whose workers receive tips.  29 U.S.C. § 203(m); Md. Code Ann., Lab. & Empl. § 3-419; Montgomery, Md. Code § 27-69.  The tip credit applies where: (1) the employee regularly earns more than $30 per month in tips; (2) the employer pays the employee at least $2.13 per hour under the FLSA, $3.63 under the MWHL, or $4.00 under the MCMWL; (3) the employer informs the employee of her rights under these statutes; and (4) the employee keeps all tips that she receives.  *Id.*  The employer must satisfy all four requirements to receive the credit, or otherwise is liable for the full minimum wage and any applicable overtime.  *See Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977) ("[I]f the employer does not follow the command of the statute, he gets no credit.").

For the first five months of her employment, Portillo consistently worked over 40 hours per week.  ECF No. 30-1 at 1.  But she was never paid a regular wage, surviving only on a portion of her tips.  ECF No. 1 ¶ 142.  For these claims, Defendants do not receive the tip credit because they failed to pay Portillo the base hourly rate, did not inform her of her statutory rights, and did not allow her to keep all her tip money.  *See id.* ¶¶ 230, 142, 163.  Accordingly, Defendants are liable for all unpaid regular and overtime wages owed to Portillo pursuant to the FLSA, MWHL, and MCMWL.  Default judgement is awarded in Portillo's favor on Counts 1 through 6.

### 2.    Tip Theft

In Counts 7 through 9, Portillo alleges that Defendants committed tip theft in violation of the FLSA, MWHL, and MCMWL when they required her to pay $10 at the end of every shift to

avoid cleaning the restaurant and to cover customers' unpaid checks.  ECF No. 1 ¶¶ 209–31;

ECF No. 30 at 23–24; *see also* ECF No. 30-1 at 1.  The FSLA expressly prohibits employers

from "keep[ing] tips received by its employees for any purposes . . . regardless of whether or not

the employer takes a tip credit."  29 U.S.C. § 203(m)(2)(B).  On these facts, Defendants certainly

violated this provision of the FLSA and so are liable under Count 7.

However, no similar prohibition exists under the MWHL and the MCMWL.  Portillo

agrees, but nonetheless argues that both codes prohibit wage theft and tips are included in their

definitions of "wage."  *See* ECF No. 30 at 23–24.  Notably, the Maryland Supreme Court has

acknowledged that theft of tips is properly captured as part of the "widespread failure to pay

workers their wages due and owing," not as a separate cause of action under the MWHL.  *See*

*Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 663 n.14 (2014).  Moreover, because

Portillo will be entitled to one recovery for the stolen tips regardless of how many statutes

Defendants have violated, *United States v. Rachel*, 289 F. Supp. 2d 688, 697 (D. Md. 2003), the

Court confines default judgment on the tip theft claim to Count 7, and otherwise denies the

motion as to Counts 8 and 9.

### 3.    Unpaid Commissions

In Count 10, Portillo alleges that Defendants violated the MWPCL by failing to pay her

an hourly wage and half of the commissions owed to her.  ECF No. 30 at 24–25.  Under the

MWPCL, an employee may recover "all compensation that is due," including commissions and

"any other renumeration promised for service."  Md. Code Ann., Lab. & Empl. §§ 3-507.2(a), 3-

501(c).  The MWPCL defines "wage" as "all compensation that is due to an employee for

employment," which can include "a commission." *Martignetti v. Int'l Bus. Machines Corp.*, 855

F. App'x 857, 860 (4th Cir. 2021) (quoting Md. Code Ann., Lab. & Empl. §§ 3-507.2(a), 3-501(c) (1)–(2)).

Portillo particularly seeks compensation for the unpaid bonuses Defendants had promised her if she sold over a certain amount of food and beverage.  ECF No. 30 at 44–45; *see* ECF No. 30-1 at 1.  Defendants clearly did not pay Portillo the promised bonuses.  Thus, they have violated the MWPCL.  Default judgment is granted as to Count 10.

### B.    Civil Rights Violations (Counts 11–16)

Portillo next brings three causes of action stemming from Reyes' and Lopez' ongoing sexual assault, in violation of Title VII, the MFEPA, and the MCHRL.  ECF No. 1 ¶¶ 236–77; ECF No. 30 at 26–31.  The MFEPA is "the state law analogue of Title VII," *Alexander v. Marriott Int'l, Inc.*, No. RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. March 29, 2011), so the Court may import Title VII law into the analyses unless Maryland law clearly differs, *see Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).  The same is true of claims brought pursuant to the MCHRA.  *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 (D. Md. Feb. 4, 2016) ("Maryland courts construe ... claims [under the MCHRA] similarly to those made under Title VII.").

And as with the federal and state wage and hour claims, Lopez and Reyes can be held individually liable for Portillo's civil rights claims if they qualify as "employers," within the meaning of the statutes.  *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 425 (D. Md. 2013).  "An individual qualifies as an "employer" in this context if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment."  *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *aff'd in pertinent part*, 900 F.2d 27 (4th Cir.1990) (en banc); *see also Taylor v. Giant of Maryland, LLC*,

14

423 Md. 628, 652 (2011) (noting Maryland's "history of consulting federal precedent in the equal employment area" given "the dearth of [Maryland] jurisprudence on this issue").  For the same reasons previously articulated, *see supra* Section III.A, Lopez and Reyes qualify as employers under Title VII, the MFEPA, and the MCHRL.  And because Wheaton Lounge and El Tipico employed 15 or more servers during Portillo's employment, *see* ECF No. 1 ¶ 29, they also qualify as "employers" under the federal, state, and local statutes.  *See* 42 U.S.C. § 2000e(b); Md. Code Ann., State Gov't § 20-601(d)(1)(i); Montgomery, Md. Code § 27-6.

Furthermore, Portillo has demonstrated joint employment such that all Defendants may be held jointly and severally liable.  The joint employment analysis focuses on the employer's authority and control over the business, the work environment, and the employee's terms of employment.  *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 412 n.10, 414 (4th Cir. 2015); *see also Salinas*, 848 F.3d at 143.  The Court must consider several non-exhaustive factors:

> (1) authority to hire and fire the individual;
>
> (2) day-to-day supervision of the individual, including employee discipline;
>
> (3) whether the putative employer furnishes the equipment used and the place of work;
>
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
>
> (5) the length of time during which the individual has worked for the putative employer;
>
> (6) whether the putative employer provides the individual with formal or informal training;
>
> (7) whether the individual's duties are akin to a regular employee's duties;

15

>(8) whether the individual is assigned solely to the putative
>employer; and
>
>(9) whether the individual and putative employer intended to enter
>into an employment relationship.

*Butler*, 793 F.3d at 414.  The Court is principally guided by whether Defendants exerted common control over plaintiff's employment.  *See id.*  And though no one factor is dispositive, the first three predominate.  *Id.*

When considering these factors, the record plainly demonstrates that Defendants shared control over Portillo's employment such that they are joint employers.  Lopez and Reyes, each as owners of the two restaurants where Portillo worked, shared the responsibilities of hiring and firing their servers.  ECF No. 1 ¶¶ 34–38.  They also managed their schedules, assigned work duties, and determined their conditions of employment.  *Id.*  Portillo worked at both restaurants, physically located in the same place, under the direct and joint supervision of Lopez and Reyes. *Id.* ¶¶ 16, 19–20, 34–38.  Accordingly, Defendants are joint employers under Title VII and the companion statues and will be held jointly and severally liable for any violations of the same.

The Court next turns to the merits of each claim.

### 1.    Hostile Work Environment

In Counts 11 through 13, Portillo pursues hostile work environment claims stemming from the pervasive sexual harassment she experienced while working for Defendants.  A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  To succeed in the claim, the facts must establish that plaintiff (1) experienced unwelcome misconduct (2) based on her sex or gender identity that was (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere and (4) is

16

imputable to Defendants.  *See Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 462 (D. Md. 2002); *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).  Additionally, the facts must reflect that the work environment was both subjectively and objectively hostile.  *See Harris*, 510 U.S. at 21.  That is, in addition to establishing that Portillo considered the violative conduct sufficiently hostile, Portillo must also show that objectively, "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" the harassment was sufficiently adverse to alter her working conditions.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23).

"The first element of a hostile environment claim, unwelcome conduct, is not a high hurdle."  *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 328 (4th Cir. 2018).  It is well-established that an employee can show that conduct was unwelcome "simply by voicing her objection to the alleged harasser or to the employer."  *Id.* at 328–29.  Portillo easily meets this burden.  She repeatedly objected to Lopez and Reyes' groping, molesting, and assault.  She told them to stop, slapped their hands away, and stated plainly she wanted no part of a sexual relationship.  *See* ECF No. 30-1 at 2–5.  The conduct, therefore, was clearly unwelcome.

Next, as to whether the offending conduct was based on Portillo's gender, *Strothers*, 895 F.3d at 329 (citing 42 U.S.C. § 2000e-2), "'[t]he critical issue" in establishing this element "'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed,'" *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25).  On this element, too, the record is clear.  Portillo was sexually assaulted.  She was targeted as a woman for sexual advances.  The conduct, therefore, was aimed at Portillo's

sex.  *See id.* at 78, 80; *see also Tinoco v. Thesis Painting, Inc.*, No. GJH-16-752, 2017 WL
52554, at *6 (D. Md. Jan. 3, 2017).

Third, the conduct was both subjectively and objectively severe and pervasive as to alter
the conditions of her employment.  *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir.
2003).  Not only was Portillo raped twice on the job, but she was also subjected to persistent
fondling and groping.  ECF No. 30-1 at 2–5.  She witnessed similar violations with at least one
other server.  *Id.*  And Lopez conveyed to her and others that involving the police would be
"stupid."  *See* ECF No. 1 ¶ 70.  On this record, where servers could not go to work without
risking sexual assault, the unwelcome conduct was sufficiently severe and pervasive to alter the
conditions of the work environment.

Last, the harassment was "imputable on some basis to her employer."  *Ocheltree*, 335
F.3d at 333.  When a "supervisor's harassment culminates in a tangible employment action, the
employer is strictly liable" for the supervisor's conduct.  *Vance v. Ball State Univ.*, 570 U.S. 421,
424 (2013).  Because Lopez and Reyes acted as Portillo's primary, if not excusive, supervisors
*and* they were her employers, clearly their conduct is imputable to the employer such that the
employers are strictly liable for the conduct.  *Id.*  Default judgment is awarded as to all
Defendants for Counts 11 through 13.

### 2.    Retaliation

In Counts 14 through 16, Portillo alleges that Defendants fired her in retaliation for
objecting to Lopez and Reyes' sexual advances in violation of Title VII, the MFEPA, and the
MCHRL.  ECF No. 1 ¶¶ 278–301.  Title VII prohibits an employer from retaliating against an
employee who avails herself of the protections afforded by law.  42 U.S.C. § 2000e-3(a);
*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–67 (2006); *Hawkins v. Leggett*, 955

F. Supp. 2d 474, 497 (D. Md. 2013), *aff'd sub nom. In re Canarte*, 558 F. App'x 327 (4th Cir. 2014) (noting that courts judge MFEPA claims under Title VII's standards); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 199 (2013).  To succeed on this claim, Portillo must first make a prima facie showing that (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) a causal link exists between the two.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).  If the plaintiff makes a prima facie case, the burden then shifts to the defendant "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason."  *Strothers*, 895 at 328 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981), and the burden shifts back to the plaintiff to raise a genuine issue of material fact as to whether the defendant's proffered reason is a mere pretext for retaliation, *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

The facts clearly establish a prima facie case for retaliation.  Portillo objected to Lopez and Reyes' sexual harassment and told them she would take legal action against them.  ECF No. 30-1 at 4.  She was fired the next month.  *See Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 395 (D. Md. 2010) (observing that protected activity includes "opposing a practice prohibited under Title VII"); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).

Further, no facts support that Defendants fired Portillo for a legitimate, nondiscriminatory reason.  The stated reason for her termination—that she prematurely took a drink from the bar before entering the purchase into the restaurant computer—is simply unworthy of credence.

Because the restaurants had only two computer stations for over 15 servers, it was commonplace to serve the drinks first and enter the purchase later.  ECF No. 30-1 at 5.  No employee was ever fired for this conduct.  *Id.*  Defendants used this event as a scapegoat to terminate Portillo as retaliation for complaining about their sexual advances.  The Court, therefore, grants default judgment on Counts 14 through 16.

### C.      Common Law Claims (Counts 17–19)

Portillo brings separate counts of battery and a single claim of intentional infliction of emotional distress (IIED) against Lopez and Reyes.  *See* ECF No. 1 ¶¶ 302–25; ECF No. 30 at 4.  Battery constitutes the intentional and "harmful or offensive contact with another without that person's consent."  *Nelson v. Carroll*, 355 Md. 593, 600 (1999).  The complained of contact "must be some positive or affirmative action on the part of the defendant."  *Saba v. Darling*, 320 Md. 45, 49 (1990).  Clearly on the facts before the Court, each defendant battered Portillo every time he groped or molested her without her consent.  Reyes pushed Portillo against a wall and tried to kiss her, and another time unzipped her dress to expose her breasts.  ECF No. 30-1 at 2.  Lopez, too, regularly groped Portillo and had forcible sex with her twice.  *Id.* at 2–5.  Therefore, this Court easily concludes that both Lopez and Reyes are liable for battery, and grants default judgment on Counts 17 and 18.

Last, as to the IIED claim.  To prevail, Portillo must demonstrate that Lopez and Reyes engaged in extreme and outrageous conduct that caused her severe emotional distress.  *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367 (2000) (quoting *Harris*, 281 Md. at 566).  This burden is a heavy one.  An IIED finding is to be "imposed sparingly."  *See Batson v. Schiflett*, 325 Md. 684, 733–34 (1992); *Hussy v. Hous. Auth. of Baltimore*, No. CCB-17-2841, 2018 WL 1947049, at *4 (D. Md. Apr. 24, 2018).  It is reserved only for conduct "'so outrageous in character, and so

20

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Batson*, 325 Md. at 733 (quoting *Harris v. Jones*, 281 Md. 560, 567 (1977)); *Hussy*, 2018 WL 1947049, at *4; *Lasater v. Guttmann*, 194 Md. App. 431, 449 (2010); *see, e.g.*, *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653–58 (1991) (IIED claim proceeds where psychologist allegedly had sex with plaintiff's wife during the time he was counseling the couple); *Young v. Hartford Accident & Indem. Co.*, 303 Md. 182, 198–99 (1985) (alleged psychiatric evaluation conducted for the "sole purpose" of harassing plaintiff until she drops the suit or commits suicide).

With a healthy appreciation for the demanding proof required for an IIED claim, the Court finds that Portillo made an adequate showing. Portillo worked the better part of a year for two men who routinely sexually violated her, and others, with impunity. *See* ECF No. 30-1 at 2–5. Portillo was dependent on her attackers for her livelihood, and so she could not meaningfully resist commands to drink to intoxication, succumb to the sexual advances of customers, and withstand Defendants' own advancements. *See id.* Defendants groped, manhandled, slapped, pushed, and fondled Portillo to the point that she was always scared to stay alone or after hours at work. *See id.* Lopez also forcibly raped her twice, and she witnessed Reyes rape her unconscious coworker. *See id.*

After her termination, Portillo was so emotionally distraught she could not work, bathe, or care for herself. ECF No. 30-1 at 5–7. To date, Portillo suffers from unrelenting anxiety and depression. She has gained 50 pounds; she has considered suicide; and she engages in self-harm by piercing and tattooing her body "because those procedures help calm the internal pain I feel." *Id.* at 6. From this, the Court concludes that judgment is warranted on this claim as to Defendants Lopez and Reyes. *Cf. Wright v. Audisio*, No. CCB-21-809, 2022 WL 4608332, at *3

(D. Md. Sept. 30, 2022) (complaint supports IIED claim based on forcibly rape of minor plaintiff "causing painful and permanent injuries" that required medical care).

The Court next turns to damages.

## IV.   Damages

### A.   Violations of the Wage and Hour Laws

For the wage and hour claims, Portillo seeks an array of damages.  They include unpaid wages, commissions, stolen tips, liquidated, and treble damages.  The Court considers each category separately.

### 1.   Unpaid Minimum and Overtime Wages

First, as to the wage and hour violations (Counts 1– 6), Portillo seeks minimum wage and overtime compensation.  ECF No. 30 at 41–43.  Importantly, the plaintiff need not "prove each hour" of unpaid wages with "unerring accuracy or certainty."  *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988).  Approximations offered through a plaintiff's sworn testimony will suffice.  *Lopez v. Lawns 'R 'Us*, No. DKC-07-2979, 2008 WL 2227353, at *3 (D. Md. May 23, 2008). So long as the plaintiff adduces evidence that establishes "the hours [she] claims to have worked and the work [she] claims to have performed for which [she] was not paid," she is entitled to damages.  *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (D. Md. 2005).  However, where a plaintiff demonstrates violations of county, state, and federal wage laws, she may recover only once, using the highest applicable wage, here Montgomery County's wage.  *Mould v. NJG Food Serv. Inc., No.* JKB-13-1305, 2014 WL 1430696, at *2 n.1 (D. Md. Apr. 11, 2014); Montgomery Md. Code § 27-68 (Editor's note (b)(1–2)).

For the first five months of her employment, Portillo worked an average of 42 hours per week.  ECF No. 30-1 at 1.  The Court applies the highest applicable minimum wage, *see Qun*

*Lin*, 247 Md. App. at 632 n.10, here, the County wage of $12 per hour, Montgomery, Md. Code § 27-68 (Editor's note (b)(1)). Accordingly, for 21.5 weeks of work, Portillo is entitled to unpaid regular wages totaling $10,320 (40 hours x 21.5 weeks x $12/hour). Portillo is also entitled to 2 hours overtime per week for a total of $774 in unpaid overtime (2 hours x 21.5 weeks x $18/hour). ECF No. 30 at 42. For the last five months of her employment, Portillo worked an average of 34 hours per week at $12.50 per hour. ECF No. 30-1 at 1; Montgomery, Md. Code § 27-68 (Editor's note (b)(2)). For this 21-week period, Portillo is entitled to $8,925 (34 hours x 21 weeks x $12.50/hour) in unpaid minimum wages. ECF No. 30 at 43. In total, Portillo is awarded $20,019 ($10,320 + $774 + $8,925) in unpaid overtime and minimum wages.

Portillo also seeks liquidated damages. ECF No. 30 at 43. Under the FLSA, "[a]ny employer who violates the [FLSA] . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A defendant may avoid a liquidated damages award if he "shows to the satisfaction of the court that the act or omission giving rise to [the] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. Defendants have not made that showing. Liquidated damages are thus proper in the amount of $20,019. *See Bocangel v. Warm Heart Fam. Assistance Living, Inc.*, No. 16-03989-PX, 2021 WL 100700, at *4 (D. Md. Jan. 12, 2021).

Portillo also seeks treble damages under the MWPCL for the unpaid wage claims. ECF No. 30 at 43, 45–46. It is well established, however, that a plaintiff is "entitled to recover liquidated damages under the FLSA or treble damages under the [MWPCL], but not both." *Quiroz v. Wilhelm Com. Builders, Inc.*, No. WGC-10-2016, 2011 WL 5826677, at *3 (D. Md.

Nov. 17, 2011).  Even if treble damages could be awarded, Portillo must also show that as a

consequence of the unpaid wages, she suffered some other losses, such as "late charges or

evictions that can occur when employees who are not properly paid are unable to meet their

financial obligations." *Villatoro v. CTS & Assocs., Inc.*, No. DKC 14-1978, 2016 WL 2348003,

at *3 (D. Md. May 4, 2016) (internal citation and quotation marks omitted).  Portillo has not

made that showing and so the Court awards liquidated damages only.

### 2. Tip Theft

As to her tip theft claims, Portillo seeks the full amount in stolen tips and an equal

amount in liquidated damages.  ECF No. 30 at 43–44.  Pursuant to the FLSA, an employer who

engaged in tip theft is liable for "the amount of the sum of any tip credit taken by the employer

and all such tips unlawfully kept by the employer, and in an additional equal amount as

liquidated damages."  29 U.S.C. § 216(b).  During her employment, Portillo worked

approximately 190 shifts, and was required to pay $10 at the end of each shift to avoid cleaning

duties.  *See* ECF No. 30 at 44.  She was also forced to pay a total of $975 ($600 + $250 + $125)

in unpaid customer bills.  *See id.*  Therefore, Portillo is entitled to recover the $1,900 (190 shifts

x $10) taken from her tips, the $975 in customer charges, and an equal amount in liquidated

damages for a total of $5,750 (($1900 + $975) x 2).  *See* § 29 U.S.C. 216(b).

### 3. Unpaid Commissions

Portillo seeks to recover her unpaid commissions and an equal amount in liquidated

damages under the MWPCL.  ECF No. 30 at 44–45.  Defendants promised Portillo that if she

sold a minimum of $600 in food and beverages on a weekday shift or $1,000 worth on a

weekend shift, she would receive a cash bonus of $60 or $100 respectively.  ECF No. 1 ¶ 143.

From February 1 to June 30, 2019, Portillo worked 3 weekday shifts and 2 weekend shifts per

week and met the sales requirement two-thirds of the time, so she earned $253.33 (($60 x 3 +

$100 x 2) x 2/3) in commissions per week for a total of $5,466.67 ($253.33 x 21.5 weeks) during

her first five months of employment.  *See* ECF No. 30 at 45.  Defendants only paid her

commission half of the time, so she is entitled to $2,723.33 ($5,446.67/2) in unpaid commissions

for this period.  *See id.*

Next, from July 1 to November 22, 2019, Portillo worked two weekday shifts and two

weekend shifts per week and met the sales requirement two-thirds of the time, so she earned

$213.33 (($60 x 2 + $100 x 2) x 2/3) in commissions per week for a total of $4,480 ($213.33 x

21 weeks) during her last five months of employment.  *See* ECF No. 30 at 45.  Defendants paid

her commission half of the time, so she is entitled to $2,240 ($4,480/2) in unpaid commissions

for this period.  *See id.*  Thus, the Court awards $4,963.33 ($2,723.33 + $2,240) in unpaid

commissions, and an equal amount in liquidated damages for a total of $9,926.66.

### 4. Attorneys' Fees and Costs

Portillo rightly asserts employers held liable for wage and hour violations must pay

reasonable attorneys' fees and costs.  *See* 29 U.S.C. § 216(b); *see also* Md. Code Ann., Lab. &

Empl. §§ 3-427(a)(3), 3-427(d)(1)(iii).  Portillo, however, has made no showing of the

reasonable attorneys' fees and costs incurred.  Accordingly, within 30 days from this opinion and

accompanying order, Portillo may file a separate petition which establishes the fees and costs

owed, and in conformity with the Court's Local Rules.  *See* Loc. R. 109.2.b; App'x B.

The Court next turns to the damages arising from the remaining claims.

### B. Damages Under Title VII and Companion Statutes

Under Title VII and companion statutes, Portillo seeks compensatory and punitive

damages for having endured a ten-month saga of repeated sexual violence and coercion as a

condition of her employment.  ECF No. 30 at 48–55.  A plaintiff may seek compensation for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" arising from a Title VII violation.  42 U.S.C. § 1981a(b)(3); *see also* Md. Code. Ann., State Gov't, §§ 20-1009(b)(1)(iii), 20-1013(d); Montgomery, Md. Code § 27-9(a); *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007).  At the default judgment stage, "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress," so long as it "establish[es] that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated."  *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546–47 (4th Cir. 2003).

Portillo has submitted a detailed and robust sworn declaration chronicling ten months of sexual harassment and the psychological injuries permanently sustained.  *See* ECF No. 30-1 at 6–7.  Given the severity and duration of the sexual assaults, the combined physical and psychological effects are profound and evidently permanent.  To compensate Portillo for this, the Court awards compensatory damages of $200,000, for which all Defendants are jointly and severally liable.  *Cf. Etters v. Shanahan*, No. 5:09-CT-3187-D, 2013 WL 787344, at *5 (E.D.N.C. Feb. 6, 2013) (collecting cases), *report and recommendation adopted*, No. 5:09-CT-3187-D, 2013 WL 792834 (E.D.N.C. Mar. 4, 2013); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 96–7, 105 (E.D.N.Y. 2020).

Portillo also seeks punitive damages.  ECF No. 30 at 52–55.  "Punitive damages are 'an extraordinary remedy,' to be reserved for egregious cases."  *Harris*, 132 F.3d at 983 (quoting *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 489 (4th Cir.1988)).  Title VII authorizes punitive damages where a plaintiff demonstrates that her employer "engaged in unlawful intentional discrimination," acting "with malice or with reckless indifference to [her] federally

protected rights." § 1981a(b)(1); *see also Ward v. AutoZoners, LLC*, 958 F.3d 254, 263 (4th Cir. 2020) (citing 42 U.S.C. § 1981a(a)(1)).  An employer's establishment of an anti-harassment policy, at a minimum, reflects a good faith effort to comply with Title VII, and so will defeat any claims of malice or reckless disregard of federally protected rights.  *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 544 (1999); *Anderson v. G.D.C., Inc.,* 281 F.3d 452, 461 (4th Cir. 2002).  As to the measure of such damages, reprehensibility is the "most important indicum."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  The Court should consider whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *Id.*

Lopez and Reyes physically violated Portillo with impunity.  They also demonstrated no regard for the federal, state, or local laws expressly prohibiting their opprobrious conduct.  *See* ECF No. 30-1 at 2–5.  Thus, punitive damages are amply supported.  The best measure for punitive damages in this Court's view is an amount equal to the compensatory award.  Thus, Portillo is entitled to $200,000 in punitive damages, for which all Defendants are jointly and severally liable.[3]

---

[3] Portillo also seeks backpay under Title VII and the companion statutes for the time between her termination, November 22, 2019 through March 16, 2020, when the restaurants shuttered their doors.  ECF No. 30 at 47.  Although backpay is legally available, *see* 42 U.S.C. § 2000e-5(g)(1); Md. Code Ann., State Gov't, § 20-1009(b)(2); Montgomery, Md. Code § 27-8(a)(3), a defendant may defeat the claim where "plaintiff did not exert reasonable efforts to mitigate her damages."  *Martin v. Cavalier Hotel Corp*., 48 F.3d 1343, 1358 (4th Cir. 1995) (quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.1985)).  The problem for Portillo is that by her own admission, she was "too depressed to seek employment" after she was terminated, and so could not mitigate damages.  ECF No. 30-1 at 7.  Further, because the Court has awarded Portillo a sizeable recovery to compensate her emotional distress, the Court declines to award backpay where the record shows she did not seek alternative employment.  *See Edwards v. Sch. Bd. of City of Norton, Va.*, 658 F.2d 951, 956 (4th Cir. 1981).

### C.      Damages for Common Law Claims

The battery and IIED claims are sustained based on the same evidence supporting the statutory violations.  Accordingly, because the same prolonged pattern of sexual violence undergirds each of the common law claims, Portillo is entitled to only one recovery to redress her injuries.  *See Rachel*, 289 F. Supp. 2d at 697.  Further because Lopez and Reyes are liable for the entirety of the damage awards—$200,000 in compensatory damages and $200,000 in punitive damages—any award for the common law counts has been subsumed in the previously articulated damage award.[4]

## V.      Conclusion

For the above reasons, the motion for default judgment is granted in part and denied in part.  Judgement will be entered against Defendants as more fully articulated by separate Order.

3/25/2024
Date

/s/
Paula Xinis
United States District Judge

---

[4]  The Court recognizes that for the Title VII and MFEPA claims, Portillo's award is capped at $50,000. *See* 42 U.S.C. § 1981a(b)(3)(A); Md. Code. Ann., State Gov't, §§ 20-1009, 20-1013(e)(2).  However, no such cap applies to the MCHRL count or the common law claims. *See* Montgomery, Md. Code § 27-9; *see also Edgewood*, 212 Md. App. at 219–20.